UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CR 96-81 L |
| | : | |
| RICHARD E. PAIVA, JR. | : | |

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

This matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) and 18 U.S.C. § 3401(i) for proposed findings of fact concerning whether Defendant Richard E. Paiva, Jr. ("Defendant"), is in violation of the terms of his supervised release and, if so, for a recommended disposition. In compliance with that directive and in accordance with 18 U.S.C. § 3583(e) and Fed. R. Crim. P. 32.1, a hearing was conducted on November 22, 23, December 2, and 8, 2005. For the reasons stated herein, I find that Defendant has violated supervised release, and I recommend that he be sentenced to eighteen (18) months in prison to be followed by a period of supervised release for forty-eight (48) months.

## I. Background

On May 2, 1997, Defendant appeared before the Honorable Ronald R. Lagueux, then Chief (now Senior) United States District Judge, after previously having pled guilty to distribution of 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), a Class B felony, and was sentenced to thirty-three months incarceration and five years supervised release. A $100 special assessment was also imposed. As a special condition of supervised release, Defendant was required to cooperate with the Government and to testify before the Grand Jury and Court against Juan Capellan. Supervision commenced on April 16, 1999.

On March 18, 2004, Defendant appeared before this Magistrate

Judge and admitted to violating supervised release. See Report and Recommendation of March 22, 2004 (Document ("Doc.") #18). The basis for the violation was the commission of new criminal conduct, failure to notify the Probation Office of change in address, failure to notify the Probation Office of change in employment, and failure to submit monthly supervision reports. See id. at 2-6. Defendant admitted that the Government could prove by a preponderance of the evidence that on February 3, 2004, he had left threatening messages on the cell phone and home phone voice mail systems of Jennifer Dore ("Ms. Dore"), the mother of his children. See id. at 2, 6. Defendant similarly admitted to breaking and entering Ms. Dore's residence on February 26, 2004, by forcing open the back door, see id. at 3, 6, and to committing an assault and battery on her on October 28, 2001, see id. at 4, 6.

Defendant on April 14, 2004, was sentenced for this violation to six months imprisonment followed by five years supervised release with the special conditions that Defendant participate in mental health treatment and refrain from contact with Ms. Dore, unless through the U.S. Probation Office. See Judgment (Doc. #20) at 3-5. Supervised release recommenced on September 1, 2004, with an expiration date of August 31, 2009.

On December 6, 2004, Judge Lagueux modified Defendant's conditions to allow him to have contact with Ms. Dore. See Doc. 22 at 2 (Order granting request for modification of conditions of supervised release). Judge Lagueux took this action after Ms. Dore told U.S. Probation Officer David S. Borrelli ("U.S.P.O. Borrelli") that the condition prohibiting Defendant from having contact with her was interfering with their ability to properly care for their children. See id. Ms. Dore had cited as an example an occasion when she needed to take their younger child to the hospital and needed Defendant to look after their older child. See id. Ms. Dore also told U.S.P.O. Borrelli that she was not afraid of Defendant and did not believe that he was going

to harm her.

## II. The Present Violation

On August 12, 2005, U.S.P.O. Borrelli filed a Petition for Warrant for Offender under Supervision (the "Petition"), alleging that Defendant had violated one standard condition and one special condition of supervised release. See Petition (Doc. #23). U.S.P.O. Borrelli subsequently filed an amended petition on August 18, 2005, alleging that Defendant had violated three standard conditions of supervised release. See Petition for Amended Warrant for Offender under Supervision (Doc. #28) ("Amended Petition"). The Amended Petition alleged that Defendant had violated the following standards conditions of supervision in the manner specified:

**Standard Condition: While on supervision, Defendant shall not commit another federal, state, or local crime.**

On August 12, 2005, Defendant, in a recorded message in the possession of the Probation Office, threatened to kill Jennifer Dore.

**Standard Condition: While on supervision, Defendant shall not commit another federal, state, or local crime.**

On August 16, 2005, Defendant committed the offense of assault on a federal law enforcement officer.

**Standard Condition: Defendant shall follow the instructions of the United States Probation Office.**

On July 22, 2005, and August 3, 2005, the Probation Office instructed Defendant not to have further contact with Ms. Dore that was not through the Probation Office. On August 12, 2005, Defendant had telephone contact with Ms. Dore that was not through the Probation Office. During the course of these telephone contacts, Defendant threatened to kill Ms. Dore and their children.

## III. Travel

On August 12, 2005, United States District Judge William E.

Smith ordered the issuance of a warrant for Defendant to appear to answer to the Petition. See Doc. #23. The warrant was executed, and Defendant appeared before this Magistrate Judge on August 16, 2005. At that time Defendant was informed of the grounds for the alleged violation as stated in the Petition. Defendant requested a hearing, which was scheduled for August 23, 2005, at 10:00 a.m.

On or about August 18, 2005, U.S.P.O. Borrelli filed the Amended Petition. See Doc. #28. Following the filing of the Amended Petition, Defendant's counsel, Attorney George West, requested additional time to prepare for the violation hearing. In response to this request, the court rescheduled the hearing to September 1, 2005.

On September 1, 2005, Defendant appeared before the court. At that time, Defendant's counsel requested a continuance of the violation hearing on the ground that he intended to file a motion to recuse this Magistrate Judge. The basis for the motion was that the Amended Petition included as a ground for violation an allegation that Defendant had assaulted a Deputy U.S. Marshal and that the court might have to make a credibility determination regarding one or more Deputy U.S. Marshals who were involved in Defendant's arrest and who also have responsibility for providing security to the court. Defendant expressed his agreement with the requested continuance. The court scheduled a hearing on the motion to recuse for September 12, 2005.

At the September 12, 2005, hearing, the court announced that the Motion to Recuse, see Doc. #44, had not been referred to this Magistrate Judge. The court also noted that the Motion to Recuse sought recusal not only of this Magistrate Judge but recusal of all the judges sitting in this District. As the relief requested exceeded this Magistrate Judge's authority, the court suggested that defense counsel make an oral motion to recuse this Magistrate Judge to allow the scheduled hearing to proceed. Defense counsel did so, and the court heard argument on the oral

motion and then took it under advisement. On September 14, 2005, the court issued a memorandum and order denying the oral motion. See Memorandum and Order Re Oral Motion to Recuse (Doc. #47) ("Memorandum and Order of 9/14/05").

Defendant sought and was granted a stay of the violation hearing pending his application to the District Judge to vacate the Memorandum and Order of 9/14/05. See Doc. #48, #52. On September 16, 2005, Defendant filed his application to vacate the Memorandum and Order of 9/14/05. See Defendant's Application to the District Judge to Vacate the Order of Th[e] Magistrate Judge Declining to Recuse Himself in the Instant Action (Doc. #49). This application was denied by Judge Lagueux in an order dated September 28, 2005. See Order (Doc. #56).

Following the denial of his application for review, Defendant moved to continue the violation hearing to a time on or after October 19, 2005. See Motion for Continuance of Hearing on Alleged Violation of Supervised Release (Doc. #57); see also Letter from West to Martin, M.J., of 9/28/05. This motion was granted. See Doc. #59. On October 20, 2005, Defendant sought a further continuance of the violation hearing. See Motion for Continuance of Hearing on Alleged Violation of Supervised Release (Doc. #61). The court granted the latter motion on October 21, 2005. See Doc. #62.

On October 27, 2005, Defendant's violation hearing was scheduled for November 17, 2005. See Letter to Browne and West from Martin, M.J., of 10/27/05. However, counsel for the Government was on military duty on that date, and the hearing was rescheduled for November 22, 2005.

**IV. The Violation Hearing**

The hearing commenced on November 22, 2005. The Government presented three witnesses to prove the allegations in the Amended

Petition.[1]

**A. U.S.P.O. David Borrelli**

U.S.P.O. Borrelli testified to the following facts. He originally sought the special condition of supervision that Defendant have no contact with Ms. Dore except through the U.S. Probation Office because Ms. Dore wanted it. However, she later denied that this had been her wish, and she asked U.S.P.O. Borrelli in late 2004 to have the condition removed. Ms. Dore told him at that time that the condition interfered with her and Defendant's ability to care for their children.

In compliance with Ms. Dore's request, in December 2004 U.S.P.O. Borrelli sought a modification of Defendant's conditions of supervision to allow him to have contact with her without having to go through the Probation Department. See Doc. #22. The modification was granted, see id., and for the first five months of 2005 Defendant and Ms. Dore appeared to be on good terms. During this time they had a significant amount of peaceful interaction with each other.

Around June of 2005, U.S.P.O. Borrelli learned through talking with Defendant that the relationship had deteriorated. Ms. Dore was not allowing Defendant to see his children, and Defendant was upset about this. In early July 2005, U.S.P.O. Borrelli attempted to persuade Ms. Dore to allow Defendant to see the children, but he was unsuccessful. U.S.P.O. Borrelli believed that Ms. Dore's position regarding visitation was unprincipled.

On July 22, 2005, U.S.P.O. Borrelli directed Defendant not to have any contact with Ms. Dore. U.S.P.O. Borrelli did so

---

[1] The court summarizes the testimony of the witnesses without regard to whether it was elicited on direct or cross-examination in order to achieve a chronological presentation of the facts. U.S.P.O. Borrelli was called as a witness by both the Government and Defendant. His testimony from both appearances on the witness stand is contained within the summary which begins above.

because of their troubled relationship and also because he was aware that a court in Fall River, Massachusetts, where Ms. Dore resided, had issued a restraining order against Defendant. Although Defendant was very frustrated over his inability to see his children, he told U.S.P.O. Borrelli that he would follow U.S.P.O. Borrelli's directive.

On August 3, 2005, U.S.P.O. Borrelli had another conversation with Defendant. Defendant told him that if he did not get visitation with his children, he would have to take matters into his own hands. During this conversation, Defendant was very agitated and upset. He was pacing and sweating, and his fists were clenched. He had difficulty finishing his sentences. At one point, he made a statement to U.S.P.O. Borrelli to the effect that "if I were you, I could see how you might be concerned by my statement that I might have to take matters into my own hands." U.S.P.O. Borrelli again told Defendant not to have any contact with Ms. Dore.

On August 12, 2005, U.S.P.O. Borrelli was contacted by Ms. Dore, who complained to him that Defendant was repeatedly telephoning her and threatening her. She wanted U.S.P.O. Borrelli to take action against Defendant. He declined to do so without some evidence to support her complaint.[2] He suggested that she record the calls.

Later that day, U.S.P.O. Borrelli went to Ms. Dore's place of employment, a hair salon in Providence, Rhode Island, and obtained from her a digital recording device which she stated

---

[2] U.S.P.O. Borrelli testified that he has found Ms. Dore's statements to be incredible in the past. On one occasion, she told him that certain statements which appeared in a police report which were attributed to her (and which apparently pertained to Defendant) did not accurately reflect what had happened. U.S.P.O. Borrelli concluded that she had lied. He also testified that Ms. Dore has made complaints against Defendant and then recanted some of the facts in connection with those complaints and that she has repeatedly sought no contact orders against Defendant and then subsequently had the orders removed.

contained recordings of telephone calls which Defendant had made to her. He took possession of the recording device, and it has been in the custody or control of the Probation Department since that time.

U.S.P.O. Borrelli agreed with defense counsel that Ms. Dore was as much to blame as Defendant for the conflict between them. He further agreed that Ms. Dore had told him that during arguments both she and Defendant would yell and scream. In addition, U.S.P.O. Borrelli agreed with defense counsel that Defendant is given to bluster and exaggeration when he speaks.

U.S.P.O. Borrelli testified that he has significant training in the field of domestic violence. He concurred with the prosecutor that it is not unusual for a person to make a complaint of domestic violence and then recant the complaint.

U.S.P.O. Borrelli stated that Defendant told him on August 12, 2005, that he was coming to turn himself in on the warrant. U.S.P.O. Borrelli had made arrangements in the past for such voluntary surrenders by Defendant. They spoke on the telephone several times that day. However, the hour grew late, and it was not possible to effectuate Defendant's surrender on August 12th.

From August 14 to 18, 2005, U.S.P.O. Borrelli was at the Connecticut State Police Academy for training purposes. He had telephone conversations with Defendant on the 14th and 15th. During these telephone conversations, Defendant indicated that he wanted to have U.S.P.O. Borrelli present when he surrendered and that he was not comfortable surrendering without his being present. U.S.P.O. Borrelli attributed this desire by Defendant to the fact that Defendant trusted him.

**B. Jennifer Dore**

Ms. Dore testified to the following facts. She did not remember asking to have the no contact condition included as a condition of Defendant's supervised release. However, she remembered asking to have it removed. She stated that the

removal was necessary so Defendant could care for their children when she was unable to do so.

Ms. Dore agreed with defense counsel that in the past she has sought restraining orders against Defendant which she subsequently abandoned and then recommenced family relations with him. She acknowledged telling U.S.P.O. Borrelli that she was partially responsible for the conflict between she and Defendant. She agreed that from December of 2004 to May of 2005 she and Defendant renewed family relations, that they had contact with each other two to three days per week, that they had meals together, and that Defendant performed household chores such as washing and ironing. However, the relationship between them deteriorated around the end of June or beginning of July 2005.

Ms. Dore admitted that the language which she and Defendant used during arguments was crude and vulgar. It was common for both of them to use the "F-word" and to repeat the same things over and over. She agreed that it was the pattern of their relationship. She also admitted that in January 2005 there was an incident during which she screamed, spit, and threw objections at Defendant.

Ms. Dore also acknowledged that she objected to Defendant having a relationship with Lisa Wild. She did not want her children to be around Ms. Wild. She admitted sending a letter to Ms. Wild, telling her that Ms. Wild would not end up with Defendant. She also admitted to making harassing telephone calls to Ms. Wild.

With regard to the issue of visitation, Ms. Dore acknowledged that in January of 2005, when she filed an action for child support in the court in Fall River, she checked a box on one of the papers to indicate that Defendant should be given reasonable rights of visitation. She denied that during the summer of 2005 she was opposed to giving Defendant visitation with the children. Initially, she stated that he was free to visit at that time, but then acknowledged that the retraining

order prevented him from doing so. Ms. Dore claimed that because they could not agree on a visitation schedule, she wanted the court (in Fall River) to decide about visitation.

On August 12, 2005, Defendant telephoned her at her place of work twenty to thirty times. After speaking with U.S.P.O. Borrelli she purchased a digital recorder at Radio Shack and recorded approximately eight of the calls.

The recordings of the calls were played. Ms. Dore identified the recorded voices as being hers and Defendant's. Among the statements which can be heard on the recordings and which Ms. Dore identified as being made by Defendant are the following:

> You will fucking pay, ok? Wait and see when you fucking show up ....

Recording #1.

> Wait and see what happens when you fucking show up for court with your fucking blow job of a fucking lawyer .... You want to take my kids from me? Wait and see. And call Borrelli, if Borrelli ever comes looking for me again, you're a fucking dead woman. Guaranteed.

Recording #2.

> Go ahead and record. I'll go to jail for fucking twelve months or whatever. You, you will not fucking live, ok? You will not fucking live. Ok? Go ahead, go ahead and make it so I can't see my fucking kids. Do everything you want, Jen. Ok? .... I'll tell you what I've got the balls to put a fucking knife through the back of your fucking skull.

Recording #3.

> Go ahead record all you want. Take it to court. I guarantee, Jen, you won't live to see the fucking next sunrise, ok? Because I am done playing your fucking games. [If] I do not see the kids after that court date Monday, or anything happens, you will be going in a fucking body bag ....

Recording #4.

> I will be there Monday morning. I'm going to tell you that. I'm going to guarantee you that. I will be there Monday morning. Go ahead and pull one thing. Pull one thing. I don't get - I don't get my visitation to both my kids when I want, I guarantee you, Jen, that I will take matters into my own hands.

Recording #5.

> You better leave work now.

Recording #6.

> You are fucking done. I'm going to fucking jail. Don't worry. I will go to fucking jail. You will not live to make this fucking day. Do you hear me? Do you hear me? You will not fucking live to see the fucking sun go down .... Guaranteed you and your fucking kids will not live to make this fucking day go. Ok?

Recording #7.

> Next time, next time when you come out from the back yard after you go upstairs and get your sweater, I will fucking choke the living hell out of you. I will go to fucking jail, I will go to fucking jail. I will only do a year or two, it doesn't fucking matter. Ok? I've done it. I've done it .... And, and, go ahead and use it. And, when I get out, you--first of all, they're going to have to come get me, ok? They're going to have to come get me, first, ok? Go ahead and use it. All I'm telling you, and this is the last time I'm telling you this. [If] I have any bullshit from you and I don't get to see my kids after Monday's court date, I swear on my sister's soul you will not live. Take it as a direct threat ....

Recording #8.

Ms. Dore acknowledged that she recorded the calls because she wanted to obtain evidence against Defendant. However, she also stated that she was concerned about Defendant's statements.

**C. Deputy U.S. Marshal Michael Wattik**

Deputy U.S. Marshal Wattik ("Deputy Wattik") testified that he participated in the arrest of Defendant on August 16, 2005. He and Deputy U.S. Marshal Ross Mueske arrived at 15 Riviera Drive, Narragansett, Rhode Island, in the late morning. They

observed Defendant in the front yard. See Defendant's Exhibits ("Exs.") D, E (Photographs of front of house). He appeared to be talking on a cell phone. Deputy Wattik notified two other Deputy U.S. Marshals, Brian McDonald ("Deputy McDonald") and Robert Charette ("Deputy Charette"), who were in the vicinity that they had observed Defendant at that location.

Defendant moved behind the house and out of Deputy Wattik's sight. Deputy Wattik proceeded to the rear of the house where he was able to regain sight of Defendant. See Defendant's Ex. G (Photograph of rear of house). Deputy Wattik observed Deputy Charette approaching the house from the rear. It appeared to Deputy Wattik that Defendant saw Deputy Charette and immediately ran or jogged up the steps leading to a side door of the house. See Defendant's Ex. F (Photograph of side of house). Deputy Wattik followed Defendant. The marshals stopped at the door and announced: "Police! U.S. Marshals! Richard, come out!" Defendant did not come out, and the marshals entered the house.

Inside they encountered an unidentified female who asked them why they were there.[3] They asked where "Richard" was, and the woman responded that she did not know. The marshals proceeded to search the first floor of the house but did not locate Defendant. Deputy McDonald then noticed a door leading to the cellar. See Defendant's Ex. H (Photograph showing door).

Three deputy marshals, Charette, McDonald, and Wattik (in that order) descended the cellar stairs. See Defendant's Ex. I (Photograph of cellar stairs). The cellar was very cluttered. At the bottom of the stairs Deputy Charette went to the right, and Deputy McDonald went to the left. See Defendant's Ex. J (Photograph of cellar showing stairs). Deputy Wattik was still on the stairs when he heard Deputy Charette giving commands to someone. Deputy Wattik turned to look in the direction from

[3] This person was Lisa Wild, the occupant of the house and Defendant's girlfriend.

which the commands were coming. See Defendant's Exs. K, L (Photographs of cellar). When he did, he saw a set of arms come out towards Deputy Charette and wrap around Deputy Charette's waist.[4]

Deputy Wattik observed that Deputy Charette was in distress. Deputy Wattik proceeded to his assistance. There was only a narrow path between the clutter leading to the area where Deputy Charette and Defendant were struggling. Deputy McDonald was in front of Deputy Wattik and fell, blocking the path. Deputy Wattik picked up Deputy McDonald, and they continued moving forward.

When they reached Deputy Charette, he was pinned against the cellar wall. Deputy McDonald got on Defendant's chest, and Deputy Wattik grabbed Defendant's legs. They gave Defendant orders (presumably to let go of Deputy Charette and stop resisting), but he did not comply. Defendant did not let go of Deputy Charette until they pulled him off. Defendant did not submit willingly to being handcuffed. He attempted to frustrate the marshals' efforts to stand him up by dropping his legs. However, this resistance ceased when the marshals got Defendant up to the first floor.

There was glass and other debris on the floor in the area where Deputy Charette and Defendant struggled. See Defendant's Exs. K, L. It may have come from a mirror or picture frame which had fallen over and broken. Photographs of the basement were introduced into evidence. See id. However, Deputy Wattik testified that the appearance of the basement in the photographs is much cleaner and less cluttered than it was on the day Defendant was arrested.

The marshals placed Defendant in their vehicle. During the

---

[4] On direct examination, Deputy Wattik testified that Defendant "lunged" at Deputy Charette, but on cross examination he acknowledged that the word "lunged" did not appear in his report.

ride to Providence, he either fell asleep or lost consciousness. Defendant was bleeding. Defendant had blood around his nose and mouth. They asked him if he wanted medical attention, but he either did not respond or declined.

After presenting the above three witnesses, the Government rested. The following witnesses were presented by the defense.

**D. Dr. John Riedel**

Dr. Riedel testified that he is a contract physician who works at both the Wyatt Detention Center and Memorial Hospital. He had no independent memory of interacting with Defendant. However, he read from medical records pertaining to Defendant. The notes indicated that Defendant reported he had sustained blows and scrapes when he was arrested. Defendant had a swollen nose and an abrasion on his shin. Defendant told the doctor that he sustained a blow to his ear. There was some blood behind the ear drum. Dr. Riedel testified that injuries were consistent with what Defendant told him.

Defendant's Ex. N, a page of medical notes from the Wyatt Detention Center, was admitted as a full exhibit with the stipulation that there has been no independent verification of the accuracy of the information contained in the records. Ex. N reflects the following entries:

> 8/17/05 9 A[M] P: "They beat the piss outta me." A: Mult[iple] superficial abrasions to forehead, nose, both shins, knees, L[eft] flank, L[eft] upper back. Detainee states approximately 3 U.S. Marshal[]s repeatedly struck him & threw him to the ground. Urine dipstick + for blood. c/o dizziness & [headache] as well. P: wounds cleansed, Tylenol for pain, RTC for medical assessment.
>
> 8/18/05 [Patient] sustained blows and scrapes when he was arrested & wants to be checked. tender nose - No obvious displacement but it is swollen. [illegible] Neck & back supple, Non-[illegible.] L[eft] lateral 10th rib slightly tender. Lungs [illegible]; lateral diffuse wheeze. Abd[omen] soft, non-tender - deep abrasions to shins but no lac[eration]s, gait [illegible].

Defendant's Ex. N.

Subject to the same stipulation, Defendant also introduced as a full exhibit records and photographs from the Wyatt Detention Center. See Defendant's Ex. O.[5] One of these records is an Incident Report dated August 17, 2005. In the section labeled "Summary" it states:

> Detainee Paiva, Richard, #CT10175, intaked 8/16/05. Assessment reveals multiple superficial abrasions and contusions to various areas of his body (see Body Sheet). Detainee alleges 3 US Marshals assaulted him repeatedly. Wounds cleansed and covered with dressings. Detainee booked for assessment with MD. End.

Ex. O (Page 1).

**E. Lisa Wild**

Ms. Wild resides at 15 Riviera Drive in Narragansett, Rhode Island. Defendant is her boyfriend. On August 16, 2005, Ms. Wild, her nine year old daughter, Ivy, her ten year old goddaughter, Lindsay, and Defendant went out together for lunch. They went to Calvitto's [phonetic spelling] for pizza. It was an enjoyable time. Afterwards they returned to 15 Riviera Drive and were planning to use the pool.

They went inside the house to change clothes. Ms. Wild went into the bathroom. While there she heard a commotion inside the house. She ran out of the bathroom and saw men with guns running around inside the house. They asked her where Richard was. She responded that she did not know. Ms. Wild explained that at the time she did not know where Richard was in the sense that she did not know if he was in the house or whether he had already gone outside. The men, whom she learned were marshals, motioned her outside. After arriving outside, she was required to stand next to a neighbor's shed.

Ms. Wild was shown photographs of Defendant which were taken shortly after his arrest. See Defendant's Exs. M-1, M-2, M-3, M-

---

[5] Ex. O consists of three written pages and nine computer printed photographs of Defendant. The first written page is not numbered and the second and third pages are numbered "Page 1" and "Page 2" respectively.

4, O-2, O-3, O-4, O-5, O-6, O-7, O-8, O-9. She testified that the abrasions and scrapes which appear on Defendant in the photographs were not on him prior to his arrest by the marshals on August 16, 2005. She described him as being in perfect health.

After Defendant had been taken into custody and placed in the car, Ms. Wild attempted to see or speak to him, but was told by Deputy McDonald to "get in the fucking house." She further stated that Deputy McDonald threatened to shoot her dog, whom she described as "not good with strangers," and that he also threatened to have DCYF (Department of Children, Youth, and Families) take her children.

Ms. Wild went into the basement after the marshals allowed her to reenter the house. She characterized it as being in utter chaos. Numerous things were turned over. The door in the playroom was torn off its hinges. There was a lot of broken glass. A picture frame was broken. A light bulb had apparently been thrown into the play room and was broken. There was a large pool of blood on the floor in the same area where Deputy Wattik testified Defendant had been arrested. See Defendant's Exs. K, L.

Ms. Wild testified that Defendant had clothes in the basement. She identified the shirt which Defendant was wearing at the time he was arrested (Defendant Ex. P). She obtained the shirt from the Wyatt Detention Center and gave it to Defendant's attorney, Mr. West. She identified a tear at the collar of the shirt and testified that the tear was not present when they had gone to lunch on August 16th. On cross examination, Ms. Wild was asked to point out any blood on Defendant's shirt. She pointed to several small spots.

**F. Deputy Marshal Brian McDonald**

Deputy McDonald was involved in the arrest of Defendant. He acknowledged that the marshals did not try to persuade Defendant to turn himself in before they went out to execute the arrest

warrant. Deputy McDonald confirmed that when they descended the cellar stairs, Deputy Charette was in the lead and that he was second.

### G. Deputy Marshal Robert Charette

Deputy Charette participated in the arrest of Defendant on August 16, 2005, but he was not in charge. As he approached the house, he observed some children in the backyard.

When he descended the cellar stairs, he had his weapon drawn, a .40 caliber Glock. He felt comfortable having it drawn in that situation.[6]

## V. Standard of Proof

"To revoke a defendant's supervised release, the government must establish by a preponderance of the evidence that the defendant violated the terms of the supervised release." United States v. Goad, 44 F.3d 580, 585 (7th Cir. 1995). Thus, this court applies a preponderance of the evidence standard.

## VI. Findings of Fact

### A. The August 12, 2005, Threat to Kill Jennifer Dore

Although there are multiple reasons to doubt Ms. Dore's overall credibility, her complaint that Defendant threatened to kill her on August 12, 2005, is corroborated by the recordings of their telephone conversations. Accordingly, I find that the Government has proven that Defendant threatened to kill Jennifer Dore on August 12, 2005. I base this finding on the recordings contained in the digital recorder, Ex. 1, and on Ms. Dore's testimony that the voices on those recordings are hers and Defendant's. I also accept her testimony that she was concerned by Defendant's statements. I do so because of the chilling nature of the statements and my belief that only an exceptionally brave or reckless person would be unconcerned after receiving

[6] Although Deputy Charette was the alleged victim, neither the defense nor the Government asked him any questions concerning the assault, a circumstance which the court observed was unusual.

such threats.

Having found that Defendant threatened Ms. Dore's life on August 12, 2005, the next question is whether such conduct constitutes a federal, state, or local crime, as alleged in the Amended Petition. The defense cited State v. Pule, 453 A.2d 1095 (R.I. 1982), for the proposition that "a threat to kill without more does not constitute a criminal offense under the laws of this state," id. at 1097. It appears that this statement is still good law as the Rhode Island Supreme Court has cited it as recently as 2002. See State v. Torres, 787 A.2d 1214, 1221 (R.I. 2002). The defense also argued that while Defendant possibly could have been charged with making harassing telephone calls to Ms. Dore, he was not and that such offense could not be the basis for a finding that Defendant committed a crime.

The fact that Defendant may not have been charged with a criminal offense in connection with the threatening statements which he made to Ms. Dore on August 12, 2005, is not determinative of the question of whether he has committed a federal, state, or local crime. If a defendant's conduct constitutes a criminal offense, it is immaterial whether or not he is charged or prosecuted for that offense. However, a defendant must have notice of the grounds upon which it is alleged he has violated supervised release. Here the conduct which the Amended Petition alleges constitutes a crime is not that Defendant made harassing telephone calls to Ms. Dore, but that he threatened to kill her. See Amended Petition at 2. Thus, a finding that Defendant committed another federal, state, or local crime must be based on this act and not on some other conduct which was not specified as the basis for the alleged violation.

The Government argued that Defendant's conduct in making the threats constitutes a violation of 18 United States Code

("U.S.C.") § 1512 which makes it a crime to use the threat of physical force against any person with intent to influence, delay, or prevent the testimony on any person in an official proceeding. See 18 U.S.C. § 1512(a)(2)(A).[7] The Government's theory is that Defendant was attempting to influence Ms. Dore's testimony at the upcoming court hearing in Fall River regarding visitation. However, the term "official proceeding" is defined in 18 U.S.C. § 1515, and it is clear that the scheduled hearing in the Massachusetts state court does not fall within the statutory definition of "official proceeding."[8] Therefore, I

---

[7] 18 U.S.C. § 1512(a) provides in relevant part:

> (2) Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to--
>
> (A) influence, delay, or prevent the testimony of any person in an official proceeding;
>
> ....
>
> shall be punished as provided in paragraph (3).

18 U.S.C. § 1512(a)(2).

[8] 18 U.S.C. § 1515 provides in relevant part:

> (a) As used in sections 1512 and 1513 of this title and in this section--
>
> (1) the term "official proceeding" means--
>
> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) a proceeding before the Congress;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or

find that Defendant's conduct did not violate 18 U.S.C. § 1512(a)(2).

Although the court has rejected the Government's contention that Defendant's conduct violated 18 U.S.C. § 1512(a)(2), this does not end the matter. It is not necessary that the Amended Petition allege that Defendant violated a particular criminal statute. It is not even necessary that the Government, in arguing that Defendant has committed a new criminal offense, correctly identify the statute which criminalizes Defendant's conduct. All that is necessary is that the court be satisfied by a preponderance of the evidence that the conduct specified in the Amended Petition violate some federal, state, or local law.

The court concludes that Defendant's conduct violated R.I. Gen. Laws § 11-35-17.[9] Among other prohibited acts, this statute

---

> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;
>
> ....

18 U.S.C. § 1515(a).

[9] R.I. Gen. Laws § 11-35-17 (2003 Reenactment) provides in relevant part:

> (a) Whoever shall originate a transmission by facsimile machine, or other telecommunication device or shall telephone any person repeatedly or cause any person to be telephoned repeatedly for the sole purpose of harassing, annoying, or molesting the other person or his or her family, whether or not conversation ensues; or **whoever** shall originate a transmission by facsimile machine, or other telecommunication device or **shall telephone any person for the purpose of using any threatening**, vulgar, indecent, obscene, or immoral **language over the telephone, shall be guilty of a misdemeanor** and shall be punished by a fine of not more than five hundred dollars ($500), or by imprisonment for not more than one year, or both.

makes it illegal to telephone a person for the purpose of using any threatening language over the telephone. I find that Defendant's conduct on August 12, 2005, violated this statute because he used the telephone to threaten Ms. Dore. Accordingly, I find that the first ground for the violation has been proven.

**B. The August 16, 2005, Assault on a Federal Law Enforcement Officer**

**1. Proof of Violation**

The defense argued that the account given by the deputy marshals of Defendant's arrest does not add up. Noting that Deputy Charette testified that he had his weapon drawn as he descended the stairs, the defense contended that it is implausible that Defendant would have lunged at Deputy Charette in the face of a drawn weapon. Of course, this scenario assumes that Deputy Charette did not re-holster his weapon at some point before having physical contact with Defendant. The court declines to make this assumption. As previously noted, Deputy Charette testified at the hearing and could have been asked about his encounter with Defendant. The fact that Defendant chose not to do so suggests that he did not want the matter of where the weapon was when Deputy Charette encountered him clarified.

The defense contends that Defendant's injuries are more extensive than can be explained by the testimony given by Deputy Wattik. Presumably, the defense's theory is that the deputy marshals used excessive force in apprehending Defendant and that they then fabricated the charge of assaulting a federal officer in order to justify, after the fact, the force they used and to protect themselves against any complaint or lawsuit brought by Defendant. After closely examining the exhibits and reviewing

---

R.I. Gen. Laws § 11-35-17 (2003 Reenactment)(bold added).

the testimony, the court is not persuaded Defendant's injuries are so inconsistent with the account given by the marshals that the court should reject their account. According to Deputy Wattik, Defendant struggled and refused to comply with their instructions. He had to be pulled off Deputy Charette. The cellar floor where the struggle occurred had broken glass and debris. It is not unlikely in these circumstances that Defendant would sustain some injuries.

Defense counsel argued that Deputy Wattik testified that no blows were struck to Defendant and that this is inconsistent with the medical records and photographs which reflect that Defendant sustained a blow to his ear. The court does not recall this particular testimony. Even if Deputy Wattik so testified, the court doubts that he meant that none of the marshals struck Defendant during their struggle with him. Given the likely chaotic situation, it is doubtful that Deputy Wattik was able to observe everything that Deputy McDonald and Deputy Charette were doing during the struggle with Defendant. In addition, Deputy Charette was described by Deputy Wattik as being in distress. Given that Charette had a weapon, there was a need to subdue and gain control of Defendant immediately. The fact that Defendant may have received at least one blow in that process does not cause the court to reject the testimony of Deputy Wattik.

The defense also contended that the marshals did not make an attempt to have Defendant surrender voluntarily and that they were intent on executing the warrant. The defense noted that Defendant had surrendered on other occasions and that he repeatedly told U.S.P.O. Borrelli that he was going to surrender on this warrant. Again, the implicit suggestion is that these facts make the marshals' account that Defendant assaulted Deputy Charette and resisted arrest less probable. The court is not so persuaded. There is no requirement that a defendant be offered

an opportunity to surrender voluntarily on a warrant, and there may be valid reasons for not doing so. For example, there is the possibility that the defendant sought will flee upon being contacted or retaliate against the person he believes to be responsible for the issuance of the warrant.

Furthermore, the evidence that Defendant intended to voluntarily surrender on this warrant is mixed. While he repeatedly told U.S.P.O. Borrelli he was going to do so, the fact is that he did not. In addition, in the last telephone conversation that was recorded Defendant makes the statement that: "[F]irst of all, they're going to have to come get me, ok? They're going to have to come get me, first, ok?" These words indicate that Defendant would not voluntarily surrender, and they could be read as suggesting that he intended to resist being arrested.

I find, based on the testimony of Deputy Wattik, Defendant assaulted Deputy Charette by wrapping his arms around the deputy's waist. This conduct violated 18 U.S.C. § 111.[10] Thus,

---

[10] 18 U.S.C. § 111 provides:

(a) In general.--Whoever--

(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties; or
(2) forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service,

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and in all other cases, be fined under this title or imprisoned not more than 8 years, or both.

(b) Enhanced penalty.--Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon

the second ground for violation has been proven.

**2. Grade of this Violation**

At the conclusion of the Government's case, the defense asked the court to rule that insufficient evidence had been presented to permit a finding that Defendant had committed a Grade A violation. The defense argued that there was no evidence that Deputy Charette had suffered any injury and that, therefore, at most Defendant was guilty only of a simple assault. See Memorandum of Law in Support of Defendant's Oral Motion, at the Close of the Government's Case, to Dismiss the Class A Violation on the Basis that the Government Failed to Meet its Burden of Proof ("Defendant's Mem.") at 5 (citing United States v. Bayes, 210 F.3d 64, 69 (1st Cir. 2000)("in a prosecution for simple assault under § 113(a)(5), it is sufficient to show that the defendant deliberately touched another in a patently offensive manner without justification or excuse")).

The court denied Defendant's request for three reasons. First, Bayes dealt with a different statute than the one at issue here, and the court doubts that the First Circuit would apply the same interpretation to § 111. Second, there is substantial case law which supports the view that:

> for practical purposes § 111 creates three distinct categories of conduct: (1) simple assault, which, in accord with the common-law definition, does not involve touching; (2) "all other cases," meaning assault that does involve contact but does not result in bodily injury

---

> (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111(a).

> or involve a weapon; and (3) assaults resulting in bodily injury or involving a weapon.

United States v. Chestaro, 197 F.3d 600, 606 (2nd Cir. 1999); accord United States v. Campbell, 259 F.3d 293, 296 (4th Cir. 2001); see also United States v. Hathaway, 318 F.3d 1001, 1008 (10th Cir. 2003)("We now join the Eighth Circuit in holding that, in the context of § 111, the definition of 'simple assault' is assault which does not involve actual physical contact, a deadly or dangerous weapon, bodily injury, or the intent to commit murder or any felony other than those referred to in § 113(a)(2)."); United States v. Yates, 304 F.3d 818, 822 (8th Cir. 2002)("We hold that, in the context of § 111, the definition of simple assault is conduct in violation of § 111(a), which does not involve actual physical contact, a dangerous weapon, serious bodily injury, or the intent to commit murder or another serious felony."); United States v. Ramirez, 233 F.3d 318, 322 (5th Cir. 2000)("With 'simple assault' having its common law meaning under 18 U.S.C. § 111, 'all other cases' refers to those assaults contemplated by the statute which do involve physical contact, but do not involve a deadly weapon or bodily injury."), overruled on other grounds, United States v. Longoria, 298 F.3d 367 (5th Cir. 2002).

Third, the interpretation of § 111 which Defendant urges would render a part of the statute meaningless. This is because the statute provides for a penalty of up to one year for simple assaults, up to eight years for "all other cases," 18 U.S.C. § 111(a)(2), and up to twenty years for assault involving bodily injury. If, as the defense contends, assaults involving bodily contact without injury are simple assaults and are punishable by up to one year in prison, and assaults involving bodily injury are punishable by up to twenty years in prison, there would be no category of assaults which would be punishable by up to eight

years in prison which is authorized for "all other cases," § 111(a)(2); see also Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992)("courts should disfavor interpretations of statutes that render language superfluous ....").

As a means of facilitating review of the grade of the violation, the court repeats that determination here. For the reasons stated above, I find that Defendant's conduct in assaulting Deputy Charette violated 18 U.S.C. § 111(a)(2) and that such conduct is punishable by up to eight years in prison. It is, therefore, a Grade A violation because it is punishable by a term of imprisonment exceeding one year and is a crime of violence. See United States Sentencing Guidelines ("U.S.S.G.") §7B1.1.

**C. The Failure to Follow the Instructions of U.S.P.O. Borrelli**

The evidence is uncontradicted that on July 22, 2005, and August 3, 2005, U.S.P.O. Borrelli instructed Defendant not to have contact with Ms. Dore and that on each occasion Defendant acknowledged receiving the instruction and stated that he would comply with it. The court has already determined that Defendant contacted Ms. Dore by telephoning her on August 12, 2005, and threatening to kill her. Accordingly, I find that this violation has been proven.

Defendant's argument that the instruction not to contact Ms. Dore should have been put in writing or made a formal condition of supervision is rejected. Such a requirement would cripple the ability of probation officers to respond quickly to changing situations and would be unduly burdensome.

**VII. Law**

**A. Statutory Provisions**

Section 3583(e)(2) of Title 18 of the U.S.C. provides that

if the court finds a defendant to be a violator of the conditions of supervised release, the court may extend the term of supervised release if less than the maximum authorized term was previously imposed and may modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release, pursuant to the provisions of the Fed. R. Crim. P. relating to the modification of probation and the provisions applicable to the initial setting of the terms and conditions of post-release supervision. In this case, the maximum term of supervised release is life and a term of five years has already been imposed. Therefore, the term can be extended for up to life.

Pursuant to § 3583(e)(3) of Title 18 of the U.S.C., the court may, after considering certain statutory factors set forth in § 3553(a), revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on post-release supervision, if the court, pursuant to the Fed. R. Crim. P. applicable to revocation of supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release. However, a defendant whose term is revoked under this paragraph may not be required to serve more than three years in prison if the offense that resulted in the term of supervised release was a class B felony. Here the offense was a class B felony. Thus, the maximum period of imprisonment which may be imposed for a violation is three years. However, since Defendant has already served six months for the previous violation, the maximum period of imprisonment which may be imposed for the present violation is thirty months.

Section 3583(h) of Title 18 of the U.S.C. provides that when

a term of supervised release is revoked and the defendant is required to serve a term of imprisonment that is less than the maximum term of imprisonment authorized under subsection (e)(3), the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment. The length of such a term of supervised release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release (here life), less any term of imprisonment that was imposed upon revocation of supervised release. See id.

**B. Sentencing Guidelines**

Section 7B1.1 of the U.S.S.G. provides for three grades of violations. Section 7B1.1(a) of the U.S.S.G. states that a Grade A violation consists of (A) conduct which is punishable by a term of imprisonment exceeding one year that (i) is a crime of violence, (ii) is a controlled substance offense, or (iii) involves possession of a firearm or destructive device; or (B) any other offense punishable by a term of imprisonment exceeding twenty years. Conduct consisting of any other offense punishable by a term of imprisonment exceeding one year constitutes a Grade B violation. Conduct constituting an offense punishable by a term of imprisonment of one year or less, or violation of any other condition of supervision, is classified as a Grade C violation. Section 7B1.1(b) provides that where there is more than one violation, or the violation includes more than one offense, the grade of violation is determined by the violation having the most serious grade. In this case, Defendant has committed a Grade A violation by committing a new felony offense that is a crime of violence.

Pursuant to §7B1.3(a)(1) of the U.S.S.G., upon a finding of a Grade A violation, the court shall revoke supervision. Therefore, the court must revoke supervision since Defendant

committed a Grade A violation.

Section 7B1.3(g)(2) of the U.S.S.G. provides that where supervised release is revoked and the term of imprisonment imposed is less than the maximum term of imprisonment imposable upon revocation, the court may include a requirement that the defendant be placed on a term of supervised release upon release from imprisonment. The length of such term of supervised release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less any term of imprisonment that was imposed upon revocation of supervised release. See id. (citing 18 U.S.C. § 3583(h)). In this case, the authorized statutory maximum term of supervised release is life. Although there has been a six month term of imprisonment previously imposed for violations of supervised release, the court may still impose up to a life term of supervised release.

Pursuant to §7B1.4(a) of the U.S.S.G., the criminal history category is the category applicable at the time the defendant originally was sentenced to a term of supervision. In this instance, Defendant had a criminal history category of II at the time of sentencing. The Revocation Table contained in §7B1.4(a) of the U.S.S.G. provides that, for a Grade A violation with a criminal history category of II, an imprisonment range of fifteen to twenty-one months is warranted.[11]

However, §7B1.4, Application Note 4 states: "Where the original sentence was the result of a downward departure (e.g., as a reward for substantial assistance) ... an upward departure may be warranted." Id. In this case, a downward departure of

[11] The Court of Appeals for the First Circuit has held that Chapter 7 policy statements (including §7B1.4) are advisory rather than mandatory. See United States v. Ramirez-Rivera, 241 F.3d 37, 40 (1st Cir. 2001); United States v. O'Neil, 11 F.3d 292, 302 n.11 (1st Cir. 1993).

twenty-seven months was made from the mandatory minimum required sentence of sixty months.

Section 7B1.5(b) of the U.S.S.G. states that, upon revocation of supervised release, no credit shall be given toward any term of imprisonment ordered for time previously served on post-release supervision.

## VIII. Sentencing Recommendation

### A. Government's Recommendation

The Government recommended that Defendant be given the maximum possible sentence of thirty months in prison. As support for this recommendation, the Government cited: 1) Defendant's disdain for possible punishments, as reflected in his recorded statements; 2) the fact that this is his second violation; 3) the vehemence of his threats against Ms. Dore; 4) the fact that Defendant is dangerous and there is a need to protect society from him; and 5) the need to teach Defendant a lesson.

### B. Defense's Recommendation

Defense counsel urged the court to consider departing downward in order to impose a sentence of home confinement or minimal confinement. In support of this request, defense counsel cited the following factors: 1) that Defendant has already been incarcerated for four months; 2) that prior to being incarcerated he was a caregiver for his elderly mother and that she still needs his assistance; 3) that he is a good worker, having been employed as hair stylist and colorist; 4) that Defendant spent four years and ten months on supervised release without being violated; 5) that he has mental health issues which should be considered in mitigation; 6) that he wants to be with his children and to support them; 7) that Defendant does not pose a threat to the general public; 8) that the crime involving Ms. Dore was a misdemeanor; 9) that the crime involving Deputy Charette involved a brief period of resistance and was limited in

duration; and 10) that the marshals were not injured and Defendant clearly got the worst of the encounter.

Defendant was given the opportunity to address the court regarding sentencing. He did so and thanked the court for being unbiased. He apologized for making the threats to Ms. Dore and stated that it was a heated and charged time. Defendant stated that he is the sole caregiver for his mother. He asked the court to consider that he peacefully served four years and ten months of supervised release. Defendant indicated that mental health counseling would be helpful to him. In response to a question from the court, Defendant stated that prior to his arrest he had been contributing $100 to $200 weekly to the support of his children, who are ages two and four.

**C. Court's Analysis**

In the court's view, there are two aggravating factors which weigh in favor of a sentence at the high end of the guideline range. This is Defendant's second violation of supervised release, and the present violation is based on more than one ground. While two of the grounds involve conduct which is closely related (telephoning Ms. Dore in violation of U.S.P.O. Borrelli's instructions and threatening her), the third ground of assaulting a Deputy U.S. Marshal involves conduct which is related only indirectly to the other two violations. This circumstance undermines the argument that Defendant's difficulty in complying with the conditions of supervised release is due solely to the problematic relationship which exists between him and Ms. Dore.[12]

If Defendant had peacefully submitted to arrest by the

---

[12] While neither defense counsel nor Defendant made this argument explicitly, the court infers from their requests that the court consider the four years and ten months of supervised release which Defendant completed without any violations.

deputy marshals, such an argument would have been bolstered, and Defendant only would have had to contend with a Grade C violation. Because he did not, he is now facing sentencing for a Grade A violation plus prosecution for a new felony which, if he is convicted, will result in a consecutive sentence. Defendant's actions at 15 Riviera Drive greatly increased his exposure to punishment.

Nevertheless, this matter is not devoid of mitigating factors. First, with reference to the assault upon Deputy Charette, three circumstances weigh in favor of a sentence at the low end of the guideline range. First and most significantly, there is no evidence that Deputy Charette was injured. Second, the entire struggle between Defendant and the deputy marshals lasted no more than fifteen or twenty seconds. Third, as evidenced by his injuries, Defendant by far got the worst of the encounter.

Regarding the telephone threats to Ms. Dore, if the court were to evaluate Defendant based solely on the recordings, it would be difficult to find any mitigating factors. Defendant's statements are reprehensible, and they undoubtedly violated both state law and U.S.P.O. Borrelli's twice-repeated instruction that Defendant not have contact with Ms. Dore. However, there is evidence which, while by no means justifying or excusing Defendant's conduct, mitigates it somewhat.

U.S.P.O. Borrelli testified that Defendant genuinely wanted to see his children, that Ms. Dore's refusal to allow Defendant to see his children was greatly upsetting to Defendant, and that Ms. Dore's position regarding visitation was in U.S.P.O. Borrelli's opinion unprincipled. The court does not accept Ms. Dore's testimony that she was not opposed to Defendant having visitation but merely wanted the Fall River court to determine the visitation schedule. Rather, the court accepts U.S.P.O.

Borrelli's testimony that Ms. Dore would not allow him to see his children. Given that Defendant was contributing to their support, his anger over Ms. Dore's unwillingness to allow him to see his children is at least understandable.

The egregiousness of Defendant's language in the recorded calls is tempered somewhat by Ms. Dore's acknowledgment that both she and Defendant frequently yell, scream, and use obscenities, including the "F word," when they argue and that this has been the pattern of their interaction. Thus, while Defendant's language and tone may be shocking or highly offensive to a person unfamiliar with the couple's manner of communicating with each other, it appears that, apart from the threats, Defendant's language and tone was not greatly dissimilar from the language and tone which Ms. Dore had utilized on other occasions when arguing with Defendant.

Additionally, U.S.P.O. Borrelli testified that Defendant was prone to exaggeration. Despite the graphic nature of Defendant's threats there is no evidence that Defendant actually intended to carry them out. Defendant favorably impressed the court when he was given the opportunity to address the court. The court accepts as true his statements that he wants to work and support his children and provide care for his mother. Defendant does not appear to pose a threat to the general public, and any threat to Ms. Dore can be addressed by the imposition of a significant period of incarceration followed by a lengthy period of supervised release which includes as a special condition that Defendant have no contact with her except through the Probation Department. A substantial period of incarceration will teach Defendant that he must strictly comply with all the conditions of supervision and that failing to do so has substantial consequences. However, the court rejects the Government's implicit argument that this can only be achieved by imposition of

the maximum sentence.

**IX. Conclusion**

After considering the various factors set forth in 18 U.S.C. § 3553(a) and for the reasons expressed above, I recommend that Defendant be sentenced to eighteen (18) months imprisonment to be followed by a period of supervised release for forty-eight (48) months. I further recommend as special conditions of his supervised release that Defendant have no contact with Jennifer Dore except through the U.S. Probation Department and that he participate in a program of mental health counseling, which includes anger management, as directed by the U.S. Probation Department.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); D.R.I. Local R. 32. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

DAVID L. MARTIN
United States Magistrate Judge
December 16, 2005